In the Matter of the ADOPTION OF Roszella Renee MORRISON, a minor child.

**Robin Judy MORRISON, a minor, Appellant,**

v.

**James MORRISON and Rita Morrison, Appellees.**

No. 47863.

Court of Appeals of Oklahoma, Division No. 1.

May 25, 1976.

Rehearing Denied July 6, 1976.

Certiorari Denied Sept. 13, 1976.

Released for Publication by Order of Court of Appeals Sept. 16, 1976.

Durrett & Johnson by Elton L. Johnson, Jr., Tahlequah, for appellant.

Todd & Lawson by John T. Lawson, Tahlequah, for appellees.

BOX, Judge:

An appeal by Robin Judy Morrison, movant in the trial court, from an order denying her motion to withdraw her consent to an adoption pursuant to the Uniform Adoption Act, 10 O.S.1971, § 60.1 et seq., as amended, 10 O.S.Supp.1975.

At issue is the validity of a written instrument executed by Robin Judy Morrison, appellant, which purported to consent to the adoption of her illegitimate child by appellees, James and Rita Morrison. The trial judge has denied Robin's motion to withdraw her consent on the ground that she knowingly and intelligently consented to the adoption and that it was in the best interest of her child that the consent be recognized and given effect.

Robin was 16 years old when, on June 9, 1974, she had her child out of wedlock. It is not clear from the record where Robin lived or what she did after leaving the hospital. Apparently she moved about from place to place for a few weeks until finally in the middle of July she let her brother, James Morrison, have custody of the child. Sometime during these weeks after pregnancy Robin was declared a "child in need of supervision" and ordered committed to Girls Town in Tecumseh. This was not the first time that Robin had been adjudicated a ward of the court. In 1972 she had also been declared a "child in need of supervision" and, after spending a few months in a girls home, she was released on probation. This probation period apparently ended some time prior to the birth of her baby.

Robin and various members of her family were aware that she was going to be placed in a girls home again and were concerned about the care and custody of her child. They discussed the problem numerous times and, though the evidence is somewhat in dispute, Robin was apparently under pressure to let her brother James and his wife adopt the infant. Finally, on the morning of July 30, 1974, Robin was taken by James to the office of his attorney, Carter Todd. Todd prepared a petition for the adoption of Robin's child. According to Robin, James and Mr. Todd told her that the papers they were preparing were merely for the purpose of giving James temporary custody of the child. James' and Mr. Todd's account of the events which occurred that morning is to the contrary. They contended that Robin was unequivocally informed that James intended to adopt the child permanently or not at all, and that she knew this when she stepped into Todd's office that morning. Furthermore, they contend, Mr. Todd carefully explained at their meeting the significance of the adoption proceeding and told her that she would have to sign a consent in front of the court.

Immediately after the papers were prepared an attorney in Mr. Todd's office escorted Robin to the office of Associate District Judge Lynn Burris. A brief hearing was held. The accounts of what occurred there differ, but it is clear that Robin signed in the Judge's presence a written consent to the adoption of her child by James and Rita Morrison.

The only parties at the hearing that morning were Robin, Mr. and Mrs. Morrison and the attorney. Robin was not represented by counsel and no guardian ad litem, other personal representative, or official of the Welfare Department appeared in her behalf. The judge made some limited inquiry, the extensiveness of which is in dispute, into whether Robin was knowingly consenting to the adoption of her child. He then signed an order directing that an investigation be held by the Department of Public Welfare pursuant to 10 O.S.1971, § 60.13. Robin was then immediately taken to Girls Town in Tecumseh by a social worker.

Soon after the hearing Judge Burris received a handwritten letter from Robin, alleging that she had been deceived by her brother and his attorneys into believing that the papers she had signed provided merely for the temporary custody of her child. She stated that she had had no intention of letting James adopt her child and that she and the putative father intended to get married as soon as she was released from Girls Town and provide a home for her child.

Judge Burris treated the letter as an application to withdraw consent to adoption, provided under 10 O.S.1971, § 60.-10 as amended, set a date for a hearing and appointed counsel to represent Robin. The hearing was held on September 13, 1974.

Briefly summarized, Robin's testimony was that she had always told James that she would give him only temporary custody of the child and that James and Mr. Todd told her that the papers she was to sign in front of the judge provided only for temporary custody. She also maintained that when Judge Burris asked her at the July 30th hearing whether she knew what she was signing she responded in the affirmative only because she believed the papers to provide merely for temporary custody.

James Morrison testified that he had not attempted to pressure Robin into giving up her baby but had made it clear that he would not keep the baby on a temporary basis while she was in Girls Town. James also maintained that Mr. Todd made it clear to Robin that she was signing adoption papers and that Robin read the instruments and then told the judge that she knew what she was signing. Rita Morrison and Mr. Todd testified to much the same thing.

The attorney who appeared at the July 30th hearing in behalf of the Morrisons testified as follows:

". . . [T]he best I can recall, Judge, you asked her if she knew what she was doing and she told you she did; you asked her if she understood this was an adoption, that the child would be with James, and she stated she understood that, and she wasn't emotional, she just sat there, and she acknowledged all your questions. Then you asked her if she wanted to sign the consent and she said 'Yes,' . . . ."

Judge Burris then made the following comment:

"Ordinarily when I do a consent to adoption I ask them and tell them they are terminating their permanent custody to the child. I don't remember this particular adoption because I do quite a few of them, but I customarily go over it with them."

The judge then ruled that Robin's "consent was valid" and that "the best place this child can be is with James Morrison and his family." Robin has appealed from this ruling.

Two questions are raised by Robin's appeal: Whether the statement of consent executed by her is ineffective because it was made without the benefit of counsel or guardian ad litem; and whether the evidence supports the trial judge's conclusion that Robin gave her knowing and intelligent consent to the adoption.

■ The first question seems to have been answered categorically by the Legislature. Section 60.5(2) of the Uniform Adoption Act, as amended, provides as follows:

"If the child is born out of wedlock, its mother, if sixteen years of age or older, shall be *deemed capable of giving consent.*" (Emphasis supplied.)

Section 60.5(3) of the act provides that if a mother is *below* the age of 16, consent to adoption will be "deemed sufficient" if accompanied by the written consent of her guardian, mother, or certain others. The implication of these two sections is that a 16 year old mother is fully capable of giving consent without the approval of a guardian or advice of counsel. It is argued however, that the legislature could not have intended this statute to have application to a mother who is not only 16 years old but is a ward of the state by virtue of a judicial declaration that she is "a child in need of supervision" within the meaning of 10 O.S.1971, § 1101(c), as was Robin at the July 30, 1974 hearing.

■ This is a novel contention. We agree with counsel for appellant that a child in need of supervision is by definition a child who needs aid, guidance and counseling and as such is perhaps more susceptible than other children of the same age to making decisions which vitally affect her rights without really appreciating the consequences. We agree, too, that the state is vitally interested in such a child and stands in the position of "parens patriae." Nevertheless, we do not think that either the ward's susceptibility to undue influence and ill-considered actions or the states' concern with a ward's well-being necessarily justify the conclusion that the ward's consent to

adopt must be accompanied by the assent of a guardian ad litem. Counsel has cited no authority for any such requirement and we have discovered none.

We think the Legislature has adequately provided for the protection of the sixteen year old mother, whether or not a ward of the state, by requiring that the consent to adopt be approved by a court and by providing in addition, a procedure for withdrawal of the consent. Moreover it has been held that the parents' consent may be revoked and an interlocutory decree of adoption set aside upon a showing of fraud, duress and intimidation, notwithstanding the provisions of 10 O.S.1971, § 60.10 rendering the consent irrevocable after entry of the decree. *In re Adoption of Graves*, 481 P.2d 136, Okl., noted in 7 Tulsa L.Rev. 206 (1971).

We are therefore unable to agree with the contention that 10 O.S.1971, § 60.5(2) is somehow inapplicable to a child in Robin's situation. If the Legislature had meant to require, in the case of a ward of the state, the approval of a guardian ad litem or representation by counsel, then it would have provided such an exception to the all inclusive language of the Uniform Adoption Act. We are not prepared to gloss over the plain language of the statute any requirement which seems contrary to its intent and purpose.

We note that the constitutionality of the Act as applied here is not questioned and accordingly we do not express an opinion with respect to that issue.

With regard to the question of whether the evidence supports the conclusion of the trial judge that Robin's consent was given knowingly, intelligently and without duress, we think it sufficient to say that the testimony was conflicting and that there was a rational basis for the trial judge's decision. In addition we think that the evidence is overwhelmingly in support of the trial judge's decision that it was in the best interest of the child that Robin's consent be recognized as valid and that the child remain with Mr. and Mrs. Morrison.

Accordingly, we affirm the judgment below.

AFFIRMED.

REYNOLDS, P. J., and ROMANG, J., concur.